All right, the next case and last case on today's calendar will be AIG Retirement Svcs v. Aurora S. A. et al. Before you begin, Mr. Dellinger, can I find out from counsel for the appellees? I see there are four of you. You have limited time available, even under generous 15 minutes. But even if I extended it back to our otherwise maybe 20 minutes, how are you planning on dividing up the argument? Thank you for asking, Your Honor. Good morning. I'm George Terwilliger, but in what case I represent the Consortium de Realizacion. Our plan was, given 15 minutes, that I would take about six to seven minutes, Mr. Ney would take three or four minutes, and Mr. Reinke would like his five minutes at the end. I think I spoke to Mr. Dellinger about this before. I think we're basically comfortable if the Court would give us about 20 minutes, particularly so that we have an opportunity on behalf of each client to answer any questions that the Court may have. All right. Well, we'll let you run 10 minutes per segment so you wind up getting, is that right? No, 20 minutes. You get 20 minutes to divide by three. I don't do the math. You do the math. Thank you, Your Honor. And we'll hold Mr. Dellinger to five. Good morning. Good morning. May it please the Court, a very brief road map might be helpful for these claims. There are two events at issue in this appeal. One occurred in 1993 and one in 1994. The 1993 event was the disposition by California's insurance commissioner of the life insurance business of Executive Life. The plaintiff, Sudamerica, which is a company headquartered just a few miles from the headquarters of Executive Life, was persuaded to put aside his own potential bid for that business and instead joined what it thought was a legitimate bid led by MAF, a French auto insurer. In that 1993 deal with MAF, Sudamerica obtained a one-third interest in the company and the right, subject to certain conditions, to acquire the remaining two-thirds of the new company in the event that MAF decided to sell its interest. Now, the second event occurred in 1994 when MAF did indeed transfer its entire two-thirds interest in New California, not to Sudamerica but to its co-defendant, Artemis, a, quote, permitted transferee under the contract between MAF and Sudamerica. And Sudamerica contends that the 1994 sale was both a breach of contract and a fraud. And even with the slightly more generous time, I think it's important to focus on those 1994 claims because they're really simpler. And I'd start with the straightforward breach of contract claim because that claim implicates an important principle. May a party be deprived of a contractual right, like the right of first refusal, by an action that is listed in the contract as permissible but is, in fact, both unlawful and undertaken in bad faith? I mean, simply, do lawless acts count? Now, that issue arises in this context. Section 4F of the contract between Sudamerica and MAF grants Sudamerica an express right of first refusal in the event that MAF desires to sell its two-thirds of the business. Our claim is that MAF's transfer, without giving Sudamerica the right of first refusal, violated that contractual provision. The defendant's response is that the transfer was to Artemis, which was one of the five names that were listed to have a right for a short time, for a year, to be, quote, permitted transferees under the contract. But the defendants, in fact, knew that the transfer to Artemis was unlawful, that it was done to prevent Sudamerica from acquiring the company and to ensure that control of the company remained in the hands of the undisclosed French conspirators. This was an unlawful and bad-faith action, and it should not have been allowed to defeat Sudamerica's right of first refusal. It was not only unlawful, it was in bad faith. Judge Scalia, on the D.C. Circuit in the timeshare case, which both parties discussed, put it quite simply. Even a permissible act is a breach of contract if it's performed in bad faith, because it is understood that acts in bad faith are never permitted. And that principle has been adopted, not surprisingly, by the Delaware Supreme Court, whose law governs the breach of contract claim. The Delaware Supreme Court said in 2005 in Dunlap v. State Farm that an implied covenant of good faith read into every contract bars unreasonable conduct, which has the effect of preventing the other parties of the contract from receiving the fruits of this bargain. And our question is, how can conduct which is unlawful not be unreasonable? Now, my second point is that— that had the transferee limitation that you're asking to be implied into it, because the transfer, as you said, was to one of the listed permitted transferees, that you're saying, well, implicitly it had to be to an entity that wouldn't create some fraudulent consequences with the insurance commissioner in California and so on. But Delaware says, well, in order for you to prevail on the good faith, implied covenant of good faith and all that, you have to demonstrate that. Had the parties surfaced this issue at the inception, they would have agreed to, in a sense, read that expressly into the language. And yet, here you are elsewhere in your—well, you don't allege that in your complaint, but that element that's not alleged or specified, and this was on a motion to dismiss. I suppose you could have been given leave to amend if that was relevant. But in any event, you have this logical conundrum that you're saying, if it had surfaced, that would have caused them to say, well, no, no, we don't want to put that in, and so you wouldn't have entered into probably the whole contract at all. So I'm a little twisted up in the Delaware law. I understand the question perfectly, and it's almost a classroom hypothetical, because what you're really asking is, what would parties have done? And I think you need, in this instance, to read in there, reasonable parties, lawful parties, have done in the position of negotiating this if they said that, you know, here are these five main parties. South America would sell the favor, clients of Cordelia and Ace, they might be interested in putting some money in during the first year. But in any event, if they had addressed the question and been specific, what would you put in that South America's right of first view is subject to transfer to these permitted transferees, whether or not that transfer is unlawful, or would they put in, if they wanted to address it, to these permitted transferees, if that is a lawful transfer permitted by law? Now, the fact that they were engaged in a fraud, I understand, means in a literal historical sense that because they had this fraudulent intent to use math for a short time for a fee as a conduit to hold this, and then get it back in the hands of Artemis, also controlled by Cordelia, Ace, and the others, that, of course, they anticipated they were going to make an unlawful transfer and wouldn't have agreed to it. I just can't believe that that is the law, that you allow a frauder to engage in what would otherwise be bad faith under a contract, because if they'd been specific about it, they would have wanted to put their fraud into the contract. Is there in contract law a requirement to negotiate in good faith? I think this is not a matter of negotiation. I think you have to ask at the inception. You're saying, well, in fact, they had this fraudulent intent. No, no. This is not about negotiating in good faith. It's about addressing your question, what would the parties have said about this particular point? Yeah, at inception. As they engaged in it. And I think you have to assume that you're asking that question with respect to lawful contracting parties and not allow a party to violate the covenant of good faith that's read into every contract by getting up and saying, oh, yeah, but we're a bunch of frauders. We wouldn't have agreed to any reasonable provision. So I think in this case, all that question does, I think the answer is you have to assume what would reasonable parties have done if you're talking about fraud. And secondly, it just leads to my second point, which is that even if the court were to think that a lawless exercise, an illegal exercise of a right could be used to trump a contractual provision like the right of first refusal, we also have a fraud claim that the trial judge independently erred in granting summary judgment on this distinct fraud claim. Every element of fraud is satisfied in this case. The defendants made false and misleading statements about the legality of the transfer to South America. South America relied on those statements because they didn't block the transfer and say, hey, we have a right to exercise our right of first refusal. And it suffered damages as a result. And had defendants spoken the truth, South America would have been able to take it over. And 4I of the stockholders' agreement contemplates that regulatory approvals were required for every transfer, and so they knew that they had to make a fraudulent joinder with false statements in it that indicated that lawful approval was being required. The only other argument they had was causation. And one reason I wanted to start with 1994 is that with respect to that purchase from the commissioner in 93, the defendants have a dozen contingencies that they discuss, which I think we effectively respond. But in 1994, the causation chain is about two baby steps long because South America had a right of first refusal. And the fact is math did sell, did transfer that two-thirds interest. There's no issue in 1994 about potential competitors because the right of first refusal means they could trump everyone else. And if the fraud had been exposed, their right of first refusal would have kicked in, and they could have trumped any other company. So it's quite clear that their expectations were defeated in this case. And the defendants have really no causation arguments except those that would be true with respect to any breach of a contract of first refusal, that if you breached that contract, who knows, maybe something would have happened. And I think this circuit's decision in City Solutions versus Clear Channel in 2004 is right on point. The question of whether a party relied on misrepresentations of another party is promptly left to a jury. Causation is a question for the jury to be decided by the preponderance of the evidence. And that in this instance, the court in City Solutions upheld the right to go to trial, to proceed, on behalf of a company who was defrauded in making a bid application and persuaded not to, thought that they were going to be doing it jointly with the defendants and in fact had to submit their own bid at the last minute and I think had a more speculative question. This is, I noted you were speaking in the earlier argument about, or at the beginning of the morning, about deference to trial judges. But in this case, there are no facts that the trial judge granted dismissal on the pleadings on the breach of contract claim and on the third claim I would mention, which is interference with prospective economic advantage. This is an instance where A and B, MAF and South America, could have entered into a transaction that the defendants unlawfully interfered with by making this illegal and unlawful transfer to the other party, to Artemis. But that's only after the fact. That's looking in hindsight because at the time the contract was entered into, it was a permitted transfer. Yes. On its face. No, there's no I just want to make sure that what we're saying is honest. I'm not disputing that. What I'm saying is you can look at it. We have three different claims, two dismissed on the pleadings, one in a summary judgment, that relate to that 1994 event. One is that it was a breach of contract because their only defense is to our right of first refusal is something that was unlawful and was stated in bad faith. Number two, that if you think that the unlawful act can satisfy the contract because it's in there, there's a fraud claim that they undertook to make fraudulent representations to South America. They have to submit a joinder when the new, when Artemis comes in to take over. It says that they've gotten approval from the commissioner of insurance so that it's a lawful transfer. In fact, they lied to the commissioner. It's an unlawful joinder. And that fraud caused us not to be able to take over the company. This is a company that South America wanted to take over in 1991 if the insurance business would be sold separately, and it was not. In 1993, we're planning to submit its own bid when the commissioner suggested, and it was represented by MAF that they had a lawful bid. South America wanted a majority of that joint bid but had to settle for a third. So a year later in 1994, they've got a right of first refusal, and every indication is, of course, they would exercise that right of first refusal. So I think the idea that you could enter summary judgment on the point of causation here seems very, very, very thin and shaky grounds at best when the causal chain, to me, seems so clear. The MAF's lawyers, as we know, had said that the 33 percent had to be offered in 1993 to avoid the possibility of a competing bid by South America. That was the focus. I would like to reserve the remainder of my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. Good morning. Restate your appearance so we'll have each. Yes, thank you, Your Honor. I'm George Terwilliger. I'm from Wharton Case in Washington. I represent the Consortium de Relation, in this case CDR, and I'm arguing on behalf of it and credibly in the matter. It's a pleasure to be here, especially with my esteemed friend and colleague, Mr. Dellinger. But I'm not surprised. He's cringing now. He knows that the knife is about to enter. I'm not surprised. That, Mr. Dellinger, does not want to talk about causation in this case too much, but would rather speak to the facts which the plaintiffs have alleged repeatedly demonstrate a fraud in the case. The causation, however, and the fatal defects in the causation in this case are, in fact, fatal to its claims throughout, including some of the interference claims that Mr. Dellinger talked about. So I'd like to address the causation issue in the case to begin with and then relate it to some of the sub-issues that are in the case and a couple of points that Mr. Dellinger made. The issue on the fraud claim at summary judgment in this case was not whether AIG was a defrauded bidder or defrauded out of exercising a right of first refusal. The issue that was presented at summary judgment was whether there was a genuine issue of material fact as to whether AIG was defrauded out of owning the insurance company, because unless there's proof that it would have owned the insurance company, then its quest for lost profits damages in this case fails, regardless of what aspects of the damages statute want to apply. So unless it could proffer facts which, if believed by the trier of fact, would prove that it would have owned the insurance company, its causation fails. And it was the absence of such facts that also caused AIG's claim to run afoul of the requirement that was noted by the district judge under California damages laws, not just as to 3343, but as to all its claims that damages have to be proved by reasonable certainty and a fraud plaintiff can never, through damages, be put in a better position than it would have occupied but for the fraud alleged. So here, in order to say that in making it whole on any of its damage claims, AIG would have to prove that it would have owned the insurance companies. And here, the problem with that is manifest in the nine contingencies that were admitted by the commissioner in his deposition testimony and referenced by the district court in its summary judgment opinion. The nine series of steps that would have to occur just as AIG predicts they would occur in order for it to prevail, and that begins with the very first question, which is would the commissioner have rescinded the bond transaction, which had been separated out earlier in the proceedings, such that there even would have been something for AIG to bid on that would have involved both aspects of the original deal, to the very last question, and one which I think deserves this Court's focus and attention, and that is having a jury predict and make a determination as a matter of fact what the Conservation Court, exercising its powers and authority to act in a discretionary manner in the public interest, would have done pursuant to Section 1037 of the California Insurance Code. In essence, what AIG seeks to prove here is in fact unknowable. And if the Court looks to the decisions in Savini, Vestar, and Vestar versus General Dynamics and Preferred Communications, all three of those decisions, which are most on point to the causation issue in this case, result in a clear conclusion that these nine contingencies, and especially the last one involving the discretionary acts of the Court here, result in a conclusion that AIG's proffered chain of causation is simply too speculative and too attenuated in order to be permitted to go to a trier of fact. I am also constrained to note that AIG takes the district court to task for allegedly engaging in inappropriate or improper fact-finding at the summary judgment stage in this case. In fact, if the Court looks to the record of what happened in summary judgment, particularly the hearing in this case, what emerges is a clear picture of the judge going through these contingencies and giving AIG every opportunity at the hearing to proffer facts which, if believed, would have created a genuine issue of material fact as to causation, and AIG was unable to meet that obligation. There is a great deal of reliance by AIG in its pleadings in this court on causation and its entitlement to damages on both the city solutions case, which Mr. Dellinger mentioned, and on Southern Union, which is a very well-reasoned decision of the District Court of Arizona that both sides have resorted to here. I'd like to talk about the Southern Union case for just a moment because I think it's very helpful to this Court in both illuminating the issues and in reaching a correct decision. That case is complex, but the decision turns on the application of the rule that damages awarded should not place Southern Union in the position, can only place Southern Union in the position it would have occupied had the misrepresentation not occurred, and no better. Even if the Court held that even if Southern Union could obtain benefit of the bargain damages, at best what it argued for was a good-faith evaluation of its merger proposal, and the Court found that because that merger proposal,  would have been subjected to determination by the stockholders as to whether to be accepted or not, that it was literally impossible to prove. Again, an attempt to prove the unknowable, and that's what AIG is asking to do in this Court is prove the unknowable. City solutions is no help to AIG's causation claim. The issue on appeal there was whether a Rule 50 judgment as a matter of law on the question of reliance should be upheld, and the Court reversed it and noted that in reliance circumstances, where there is a question of reliance, it is the rare case that shouldn't go to the jury, and only those cases where there is no basis for a reasonable mind to disagree there can be but one conclusion. This isn't a reliance case, and we're not here on a reliance case. It's not a promissory fraud case. Contrary to what's in AIG's brief, 3343, the California damages statute concerning transactions for property, wasn't even an issue in that case, the Court specifically noting in the decision that the appellant did not challenge the availability of lost profits in that case. In this case, and I won't dwell on this point. It's well spelled out in our brief. In this case, at least on its defrauded purchaser claim, insofar as the right of first refusal is concerned, 3343 does apply, and in fact bars the recovery of lost profit damages from the other two-thirds of the insurance company because AIG didn't acquire that. It bought one-third, the other two-thirds, and the Kenley decision, it seems to me, is just dispositive on that question. Turning to a couple of the points that Mr. You're watching your time, I take it. Yeah, I am. Thank you, Judge. Just turning quickly to a couple of the points that Mr. Dellinger made, and I'm sure my co-counsel will want to address these either. The causation issue is also dispositive on this right of first refusal claim and on the contract-related claim, because even if AIG got the benefit of what it bargained for in that contract, all it had was a right of first refusal, which is really not a true right of first refusal, but an opportunity to stand in line behind the permitted transferees, as well as to stand in line behind the possibility that Moth would, in fact, simply maintain ownership of the company. It's very important, and I don't have time to do it here, but I would urge the Court to consider, to analyze the fraud claim insofar as it affects what AIG did or didn't do regarding the right of first refusal. Even if they got benefit of the bargain advantages on that right of first refusal, they bargained for an opportunity. I just want to make sure I understood your point there, though. You say stand in line, but if the line is preempted because everybody, Mapp doesn't really want to unload it because it's all contingent on getting it to this illegal transferee and the other people in front of the line, in front of Sun America, are not qualified, why can't they establish that and at that point they are at the front of the line and have been defrauded out of it? Because what they bargained for, it really comes down to a question of what damages would they be entitled to, even if that were a fraud on them, which I think is a question of law in this case. The representation to them was, and what they bargained for, was that they would get the opportunity to stand in that line. Now, whether or not that line would ever come about or why it would come about, it seems to me makes no difference in terms of them getting what they bargained for. They got exactly what they bargained for, which was the right to stand in line. But that right also was that when they stood in line, the people who were ahead of them were there, for lack of a better term, lawfully or were there properly and were not there because someone let them in ahead. The problem with that claim on their part is what is it about what they were told that was a misrepresentation as to them in that regard that changed their position? Their position was whether they were in line. Whether they were in line behind a prior arrangement among the other stockholders or whether they were in line behind MOF, which never had any intention to sell and never disclosed that, seems to me to be totally immaterial to the decision they made to participate. So the issue of good faith terminates once you enter into the contract and you have your right of first refusal. And what happens subsequent to that fact is basically business. That's correct. And in addition to that, Your Honor, what they bargained for in that case was nothing more than an opportunity. The damages they're seeking as a result of that opportunity is that they would have owned the insurance company. So all the defects and causation that flow in the fraud claim are equally applicable there because there's no guarantee that on that right of first refusal they could have made a deal or for a prior fact to be able to determine what the terms of that deal would have been. Thank you. Good morning, Your Honors. Richard Nay on behalf of the two MOF entities. Let me start with the right of first refusal. I think what's important to bear in mind is the right of first refusal is distinct from an option. And the right of first refusal gave AIG no means to compel MOF to sell. And so whether MOF would retain or whether MOF would sell is pure speculation. Nobody knows what would happen under the various hypothetical situations we find ourselves. Is there no ability to demonstrate through, I don't know where this case, clearly discovery hasn't been done in this case, I gather, very much, but certainly there's a lot of litigation. Is it clear MOF would have held on to the company if the scheme didn't work out as planned? Well, there has been a lot of discovery in this case as well as elsewhere. There's a lot of discovery leading up to the summary judgment motion. There is evidence in the record that in early 1993, when the rehabilitation was in doubt, that MOF was anxious to sell. It wasn't even sure at that time that there would be a closing. However, that's not when, that's not the time period that AIG is looking at. AIG is looking at post-closing and is looking in 1994. MOF is an insurance company. If the successor, New California and its subsidiary Aurora, which took over executive life, if that's a valuable asset and AIG wants to buy it, well, there's no reason why MOF wouldn't view it also as a valuable asset. So whether MOF would sell it if the price was right, perhaps, but it's pure speculation whether AIG would have offered a price equal to its fair value. We know that in 1996. I understand, but I don't want you to. My question really goes to whether, since we're on summary judgment, it's precluded from establishing, that is, there's no way AIG could find out through discovery that MOF, regardless of how profitable New California was, might be to AIG. It was not something that MOF was interested in, had any plans on keeping. Indeed, they wanted to deal it off. And once that option fell through, they were not financially in a position to do it. I don't know. I'm just, you know, we're on summary judgment, and I don't know. Well, factual discovery could not respond to that, because we're dealing with a hypothetical situation. MOF felt it was contractually required to sell to Artemis, and therefore sold to Artemis. AIG's claim is, let's assume Artemis is out of the way, what would then MOF have done? And AIG says, well, of course, MOF would have sold in 1994 to them. And it's in a hypothetical situation that factual discovery is not going to add to that. Counsel, Judge Gould with a question for you. Yes. You know, could expert testimony address the causation issues, or is it not feasible to have competent expert views on these subjects? I don't think – well, in talking about the right of first refusal, it seems to me it would not be reliable expert testimony for somebody to try to predict what MOF would have done in 1994. I just don't see how that would be reliable under the Federal Rules of Evidence. We do have – there is an issue of this case, and I think my counsel, Mr. Reich, who briefed it really, would respond to it as to whether – and this refers to 1993 – whether the commissioner would have – if the fraud had been disclosed in 1993, whether the commissioner would have sold to AIG. The trial judge here found that testimony, which was really, here's what Commissioner Garamendi would have done, not to be a reliable expert opinion, too, particularly since Commissioner Garamendi testified himself, and we can look to his testimony as to what he would have done. If I could just respond now to a couple of the comments that were made on the – Yeah. Be brief. Go ahead. On the implied warranty. Well, we've read your briefs. I mean, the briefs are – I understand that, Your Honor. I understand that, Your Honor. On the implied covenant, Mr. Dellinger this morning said that the covenant was breached because Artemis could only gain the Department of Insurance approval through fraud. And I don't think that's correct. I mean, there was nothing about Artemis which disabled it from obtaining the approval of the Department of Insurance. The allegations about Artemis in 1994 when he was seeking approval from the Department of Insurance, it was a failure to make full disclosure. But there was nothing in the shareholders' agreement that prohibited Artemis from making full disclosure. So it's not a contract action as counsel and AIG would like it to be. But what about this point that I asked Mr. Dellinger about? This Delaware law, if we're talking about, you know, the element that – because this is – now we're on the motion to dismiss aspect of the case. And it troubles me, just as a question, Delaware law requiring that AIG have to demonstrate that on the duty of good faith to imply the term into the express proviso, they have to get over this threshold of saying that, well, if this issue had come up during the negotiations, would the parties have agreed to it? And the logic would be that, of course, if it's an up-and-up deal, it would be no big deal to put in that the parties, that any transferee, permitted or otherwise, would have to be a qualified or legitimate under law entity. I mean, do they have to do more than what they've said already about that? At that aspect of Delaware law, do they get knocked out because of that little quirk in Delaware – if it's a quirk in Delaware law? Well, I think they do. And I think that particular principle of Delaware law falls into a second principle. So they do. I asked a typically compound question. So are you saying they do get over it or they don't? No, they can't get over that, because what they're basically arguing is that Moth is going to – would Moth have agreed at the outset, if the issue had come up, to guarantee the lawfulness of Artemis, who's not even a party to the shareholders' agreement, in gaining approval from the Department of Insurance. And I guess I think it's on the face of it that it is not a jury issue. Well, does it have to – would they have to go that far? Couldn't they just say that Moth would agree that the permitted transferee or whomever it is sold to other than AIG will be a qualified purchaser that won't cause the deal to be fraudulent, as to the insurance commissioner? Again, I think my – I think I answered that, that they would be asking Moth to guarantee – No, not guarantee approval. Guarantee that they wouldn't bring in somebody who was an unlawful – Well, there's nothing unlawful about Artemis. The allegations against – about the agreement signed in – closing in September of 1993. There's nothing unlawful about Artemis. At that time, the allegations against Artemis is a year later, when it is seeking approval from the commissioner to purchase the California stock from the Moth Group, that a lack of full disclosure was made in filings to the commissioner. And I think it is radically – I think it's very much unreasonable to expect, to go back to your principle of Delaware law, that Moth would have agreed if the issue had come up in 1993 that Artemis, who Moth is a stranger to Moth, that Artemis would totally meet all regulatory requirements a year later. I would suggest, and this is the second principle that I think relates to this, that incorporating that type of obligation on Moth contractually would really amount to a radical rewrite of the stockholders' agreement. Okay. I think I get it. Right. Which is the second point. You've run out of time. I understand. Thank you very much, Judge. Okay. Thank you. We're over time, but I'm going to let you run for a little bit. Okay. I appreciate that very much. May it please the Court, my name is Fred Reinke of Doing the Buff, and we represent the Artemis parties in this appeal. Let me just quickly address two points that were just being discussed, one about Artemis being an illegal purchaser.  They still hold the Moth Group. And the second thing is, in 1994, whether Moth would have sold the shares to Sun instead of to Artemis, huge contingencies there. A number of different companies comprised the Moth Group, so all of those companies would have had to agree to sell the shares in a situation where they looked like they were somewhat profitable. And secondly, Sun did try to buy the shares in 1996 from Artemis, and when they went forward with that negotiation, they looked at the representations and warranties they would get from Artemis, which were zero. Artemis received no representations and warranties from Moth either. And Sun said, and Mr. Broad said on testimony under oath, no rational buyer would buy this company without reps and warranties, so we're not going to buy the company. So the idea that Moth would sell to Artemis is not a reasonable expectation. Let me just quickly turn to what are a number of glaring and indisputable errors of law and fact presented by AIG in their reply brief. Obviously, we did not have time to do a certain reply, but there are a number of shifting theories. And in my limited time, I wanted to quickly cover, first, that AIG disregards the 60-year-old line of California cases on the proper causation standard, which hasn't been discussed yet today. Second, only during its appeal does AIG assert a position on its reliance element. In the district court, AIG argued that it was defendants' conduct that caused AIG to pursue just 33 percent of the insurance company. Now on appeal, it asserts an entirely different theory, saying that, oh, no, its defendants duped us into not abandoning our prior decision to buy only 33 percent of the company that we agreed with the commissioner to do. The commissioner urged AIG to only buy 33 percent of NCLH. Third, I want to address AIG's appeal briefs and properly refer to 255 pages of documents that are not in the record. The court ordered those documents to be stricken. Fourth, AIG's fraud theory violates the rule that plaintiffs cannot pursue fraud damages that would put the plaintiff in a better position than if the fraud had not occurred. In fact, we made that argument four times below. And it's been made again today here. And it's been made again today. And if I have time, I'll try to make it one more time. You've made it. Go down your list. Appreciate that. Go down your list. Okay. Very good. Then fifth, AIG relies on an expert report of George Strong that's plainly inadmissible, was never admitted even in the other case for which it was prepared. And then sixth, AIG argues that as a shareholder, it is allowed to sue for damages suffered by the insurance company. And they cite the Delaware law. Excuse me. They cite the California law. But it's a Delaware corporation governed by Delaware law. So on causation. I think all of those are embedded in the briefs, I think. Can I finish my causation argument? Okay. Make that the wrap-up. Okay. Because I believe that the issue of what standard applies is critical. And it's not as ‑‑ I just want to make it clear. AIG states in its brief that the proper causation standard is preponderance of the evidence. And this is wrong. They also say that all the parties agree that's the proper standard. It is not the proper standard for the district court in looking at causation. The proper standard is reasonable certainty. And AIG itself, in its own summary judgment opposition brief, stated very clearly that the standard is reasonable certainty. Reasonable certainty as set forth in a case called Stott and in a case called Continental Carnivore. The amazingly, AIG, while citing to Stott below, does not refer to Stott at all in the brief. I think you made the point. And we can look at the law and we'll decide who's right. Could I just read into the record, please, then, the pages in the appeal brief that need to be changed because of the motion to strike? Just take a second. Why don't you send that to us in a letter? In a letter? Fine. I will do that. Copy it to the other side. Okay. Thank you. All right. I think the issues have been framed, so I don't think we need to have ‑‑ I'll not take all morning, Judge. First, you know, recall that causation is generally a question for the jury. And in our view, you have to prove the amount of lost profits to a reasonable certainty, not that you have to prove causation. Reasonable certainty, not preponderance, is the standard? On proving damages, we have no ‑‑ if that's the standard, we have no problem with it because you have the actual six‑year record. However this case is resolved, whether it's a trial or the parties have a discussion, if you're talking about lost profits, you start with what the profits were of the company and then argue up and down from that point. But I don't think that would be a difficult point. The nine contingencies that they discuss are all from 1993. I'll just briefly note that remember that Sun America actually had a draft bid. It met with the commissioner in 1993 about acquiring the entire company. It was in a position to take over the company when it was told that it could get into a one‑third relationship with MAF. With five permitted transferees who were not significant insurance companies themselves for a year, so it had an opportunity of a right of first refusal, MAF, of course, even if it was prompted, MAF wanted out because they knew it was an unlawful enterprise and understandably wanted to get out, take its fee, and transfer this to someone else. What's your response on the argument that the nine uncertainties that the district court listed out at ER 23 is a panoply of uncertainties, a chain of causation that's impossible to prove, and essentially whoever's got it grappling with it, there's just self‑evidently no way that even a jury left to its own devices would be able to reliably answer at least some of those questions. I think we respond in the brief. There are contingencies when you look at them. We address each one of them, and some are dispensable, and some are, at worst, a question for the jury. Would the commissioner have rejected the bid? Why would the commissioner have rejected the sale to a major California‑based insurance company when we already had one who was going to be approved for one‑third? The court would have had to approve. Why would the court not have done that? No one else was in the position AIG was in to submit a bid. But finally, let me note again that they want to talk about causation in 93, and they want to avoid it in 94 because with the right of first refusal, there were no other companies that could trump our bid, and it's an absolute contractual right. The contingencies they mention about that are always present in a right of first refusal. I think that that useful contractual right which parties bargain for is a nullity if you can say, well, maybe they wouldn't have come to an agreement if the defendant violates it by sending it to someone else. But, counsel, Mr. Twilliger said that what happened after the contract was initially agreed to and the right of first refusal was granted, what happened after that was, I think the term is just business, end quote. Isn't that just business the way things happened then? Because you don't have the option, it's a right of first refusal. So isn't it just business? Well, business is not to be done by fraud. I'm not sure I understand the nature of that argument. After the contract is entered into, I think parties wouldn't even think to write into a contract the assumption that people are going to carry out the obligations in a lawful manner that doesn't violate state and federal law. I think that would be understood. The fraud consists of transferring it to an entity not in a position to purchase it. Judge Matz below, not below in this case, but as Judge Matz said, they lied to the commissioner. They didn't conceal. They concealed the fact that Cordelia Nace had a majority ownership of Artemis when they filed this and was not eligible to control a U.S. insurance company. So you can't prove the unknowable. And I was about to note that this court said in clear channel that determining causation always requires evaluation of hypothetical situations concerning what might have happened but did not. So that's inevitable and inevitably in the case there. And that's why these questions are left for the jury. On the hypothetical, coming back to my little point today, picky point about Delaware law, the response was, well, nobody would have at the outset put in a requirement that MAF guarantee the approval. Is that what the implied covenant is? No, because we're not suggesting that MAF had to guarantee the lawfulness. It's different. MAF's liability comes from the fact that they knew the transfer was unlawful. They're not asking to be a guarantor. They're asking not to be a co-conspirator in an unlawful transfer that violates our breach of contract, constitutes a fraud that deprives us of that 94 opportunity to acquire it, and deprives us of economic advantage. This is on the breach of contract claim, the implied covenant, right? So Delaware law says, you know, you don't get an implied covenant against the express terms of a contract by writing in some new deal-changing aspect. So you're saying, well, no, if they'd negotiated at the outset, what they did here would have been acceptable. No, it's not. Well, yes, I understand Delaware law, but this is not a deal-changing aspect. This is an assumption that every contract has a right of good faith, and it's not contrary to the notion of the contract that if this is transferred within the first year of one of these permitted transferees, that that's going to be done lawfully, and that the only way we can be deprived of our right of first refusal, it's a very valuable right. These are companies, on that list of companies, there's no one who's a major, you know, world insurance player on those five transferees. So we were, South America was told might want to invest. So it's very much a bad faith violation of their expectation, a fraud that prevented them, wholly apart from contract, from taking over the company, and an interference with their prospective benefits. I'll be very brief, Pat. In proving damages, we do not seek for South America to be put into a better position than we would have been had the fraud not occurred. If the fraud had not occurred, if the truth had been told, we believe we would convince any trier of fact that we would have been in a position to take over that company. Kenley is different, because Kenley is a case which, if the truth had been told, these people had no intention of telling to him, he would have only been out the money he lent them and the interest on it. It's a very different case. We want to be able to prove those damages, however the case is resolved. So let me just close with two quotes that I think really sum up this case and is contrary to several of their things, two brief quotes. The first is from the excerpt of the record at 832. In 1993, Maff's lawyer writes confidentially to others in the investor group and explains to them that New California is offering South America the right to purchase 33 percent of New California's equity in order to avoid the possibility of a competing bid by South America. They were the only company offered, at par, a third of the deal. The idea that they weren't going to be a competitor if there were others and were dispensable is maligned by their own words. And then finally, less than two years later, in an internal communication between Artemus officials, one of them white senior officials, we cannot rule out, quote, we cannot rule out the possibility that some charitable soul will reveal the agreements we believe to be confidential with the natural consequence that the entire transaction would be blown and the deal handed to our friend Broad, the CEO of South America, on a silver platter. Preventing that outcome depriving South America of its opportunity to acquire this business that the defendants wanted to continue secretly to control was what the fraud and the breach of contract in this case was all about. Thank you. Thank you. Thank you all. We appreciate the argument. It's a very interesting and complicated case. It is submitted and we will stand in recess for the day.
judges: Fisher, Gould, England